Ruffin, C. J.
 

 Samuel Chesson made his will in Sep. tember, 1847, and died a few days afterwards. It begins with a gift to his wife Elizabeth, of a tract of land and two negroes, for her life, and two feather beds and furniture, to dispose of as she pleased ; and it then adds, “I also lend to my wife, during her widowhood, if she keeps my children clear of expense and educates them, all of my chattel property, of every kind, except any of my children shall marry, then she is, at her disposal, to give them such of the property as she may deem just; to be deducted out of their parts when a division shall be made.” The will, in a subsequent part, directs all the said residue to be divided equally among the testator’s children, and that his five younger daughteis should, in the division, have a negro girl each, and, if his negroes should not increase to a sufficient number in time, that some of the other negroes should be sold for the purpose of procuring the girls. By several clauses, gifts of a tract of land and a slave are made to each of two married daughters, and also to a single daughter, then grown, with a limitation over upon her death without leaving issue surviving, to the five younger daughters. By distinct clauses, also a tract of land is devised in fee to each of the testator’s five sons, Samuel, William, James A., John B., and Andrew L.; and then it gives, “to my younger daughters, namely, Ann, Elizabeth, Kizia, Susan and Lois, all the residue of my lauds, to be equally divided between them, except the child my wife now goes with be a son, and if it should, I give to such child 140 acres of land adjoining, &c., but if it should be a daughter, then an equal part of the land with the other sisters.”
 

 Mrs. Chesson was appointed executrix, and proved the
 
 *143
 
 will and took the property into possession, (including nine slaves besides those specifically given,) paid the testator’s debts, and brought up the children, who were all under age, except those before mentioned, and who resided with their mother until they respectively died or married, and some of them until her death, which took place in 18-10. To each of the younger daughters, Mrs. Chesson advanced a girl out of the stock of negroes at various times, and also to several of her sons, as they married and left her, she advanced slaves and other things. After her death/her son, Andrew L , administered on her estate, and the son James A., administered
 
 de bonis non
 
 cum, &c., on the estate of his father, and took into possession the slaves left by Mrs. Ches-son, being then sixteen.
 

 In 1842, this bill was filed by Andrew L., John B. and William L. Chesson against James A. Chesson and the other children of the testator or the representatives of such as are dead. It states that the testator owed debts to a considerable amount, but how much the plaintiffs were then unable to set forth, though they hoped to establish the same by proof: that as no particular provision for paying them was made in the will, and no part of the property could then be spared for that purpose without interfering with the other purposes of the will, Mrs. Chesson, influenced
 
 by
 
 maternal regards and with the view of advancing the general interests of her iarnily, look possession of the whole estate, real and personal, and for a considerable time used the rents and crops made from the p op. rty given herself and the plaintiffs and other children, as she could best make the same available towards the payment of the debts and the expenses of maintaining and educating the children, and thereby effected those ends ; and that the plaintiffs John B. and Andrew L. contributed their personal services for many years, (besides the produce of their land,) at. the
 
 *144
 
 request of their mother, in attending to the estate after the debts were paid, and' managing the property so as to make it productive enough to maintain their mother arid the family, including the negroes, which by reason of a rapid increase were also expensive. The prayer is, that the sums paid by Mrs. Chesson for the debts of the testator out of her own means may be ascertained, and the amounts taken.by her for that purpose, or for the maintenance of the family out of the produce of the land of the several plaintiffs, and the value of the personal services of the plaintiffs in the management and improvement of the property may also be ascertained ; and that all those amounts maybe raised in the first place, out of the negroes or their hires since the death of Mrs. Chesson, and that the residue, including advancements by the executrix, may be divided equally among the plaintiffs and the defendants, the legatees in remainder.
 

 The answers state, that the defendants believe, that the testator was but little indebted, and left debts and money, owing to him sufficient to cover what he owed ; and, at all events, that he left crops, stocks, and other perishable effects, composing parts of the residue of his persona! estate, sufficient for that purpose. It insists, that the executrix either applied those parts of the residue in that way or ought to have done it; and that her administrator cannot after such a length of time claim to be re-imbursed any sums paid by her to creditors, especially as she set up no such claim in her life time, and left no account against the estate, and made no account of her administration. The defendants state, that the plaintiffs were quite young at the testator’s death, and deny that they contributed to the payment of the debts ; and they insist, that if any of the profits of their land were used by their mother for that purpose, or if they and. the personal services of the plaintiffs
 
 *145
 
 contributed to the maintenance of the family, the claim of the plaintiffs therefor is against their mother alone.
 

 The cause was brought on heretofore, but the Court, upon the pleadings, and the proofs as then existing, declined deciding the points, and directed certain enquiries. A report has been made, from which the following facts aré collected. The executrix, soon after qualifying, made a sale of some parts of the perishable property, but she made no inventory, nor account of sales, and it cannot in any manner be ascertained, what was sold or to what amount — she returned no account current, nor made any account of -her administration. But the master found upon evidence of witnesses, that, besides the slaves, there came to the hands ot Mrs. Chesson, stock of various kinds on the plantation to the value of $750, and household and kitchen furniture to the value of $450; and that she received one debt of $400 due to the testator in four annual instalments of $100. The master also made up an account from receipts and vouchors left by her at her death, of the debts paid by the executrix; which amounted, arter deducting some improper vouchers, to the sum of $1010,52, paid at various times from 1S08 to 1818. The report further states that all the stock of furniture left, by the testator was either used by Mrs. Chesson, or had been worn out or destroyed in her life time. And it values the several advancements to the children, and states the present number of the slaves and their profits since the death of Mrs. Chesson. It also states evidence before the master, that the plaintiff, John B. Ches-son, lived with his mother from his father’s death to the year 1840, and that from 1824, when he came of age, he had charge of his mother’s business, and that his services therein were of an average value of $200 a year, and that she derived during the whole time from his land from $40 to $100 a year, all of which went to the benefit of the mo*
 
 *146
 
 ther and family, and that he received no compensation and derived no benefit therefrom, except his support as a member of the family. Similar proofs were made with respect to the profits of the lands and personal services of the sons Samuel and James A., for- different portions of time. But the master declined stating any accounts of those matters, because they were not embraced in the enquiries ordered. Upon these facts, and upon exceptions to the report, the cause has been brought on again, with a view to its being determined, whether the sums claimed in the bill for the administrator*of Mrs. Chesson, or for the sons personally, or any of them, ought to be raised out of the slaves or their profits before a division.
 

 The Court is of opinion, that neither of the charges can be sustained. The will makes it a condition, on which Mrs. Chesson was to have the whole residue of the personal estate during widowhood, that she should keep and educate the children “ clear of expense,” and she could not therefore prefer any claim therefor against the children or estate. If she,could not, it follows, necessarily, that the sons cannot; for they can claim, if at all, only through her, who received their money or services. It is not stated that her estate is not sufficient to compensate
 
 them;
 
 and if it be, there is no principle on which they can pass by that, and come on the children for what she was bound to furnish. But it is the same whether she left any estate or not. For, if she was bound to keep the children as long 'as they lived with her, the debt to the sons for their services and money used by her, was exclusively her debt; and if she was only bound to keep them during their minority, it is obvious, as she left no charge and made no claim against them, that they all resided together as members of one family, and the children were maintained, gratuitously, by their mother, as far as the services of each failed to
 
 *147
 
 supply his or her- own necessities. In assisting their mother in the management of the property, the sous proved themselves to be dutiful and good sons; but they cannot make their brethen pay them for being so.
 

 The claim on account of the debts is next to be considered. No doubt an executor, who, in his cash account, is in advance for the estate, may hold on to the specific property for reimbursement. So, if the profits of property given for life, and then over, be taken for payment of debts, the tenants for life may claim from the remainderman a contribution, in proportion to the values of their interests. If we could see, with any reasonable degree of distinctness, that such was the fact in this case, the administrator of Mrs. Chesson might, perhaps, have relief. But, notwithstanding all the disadvantages under which the defendants are left by the omisssion of the executrix to furnish information of the particulars of the estate, its disposition, and the debts paid, by an inventory, account of sales, or account current, the defendants have been able, after the lapse of more than forty years, to establish affirmatively, that, besides the slaves, perishable property of various kinds, and money received from debts, came to the hands of the executrix to the value of $1600, and that thereout, throughout the course of ten years, she paid, in debts, only $1010 52. It is true, that it does riot appear that she sold all the stock and furniture; and it is assumed she did not, but sold only a part of it. Yet she left no document showing what part, and, as it only required about $600, after deducting the $400 collected by her, to cover the whole amount of the debts, including the interest accumulated, it is but a reasonable presumption, that she may have received from those sales, or from other debts or resources belonging to the testator,--who appears to have been the Clerk of the County Court, — a sum sufficient for that pgr-
 
 *148
 
 pose. '■ Strictly speaking, indeed, it was, perhaps, her duty to have sold the perishable property, and, after paying the debts out of the proceeds, invested the residue, so that she might have the interest during life, and left the capital for the remaindermen. But that was, probably, not the actual intention of the testator, and it need not be insisted on here; because the circumstances lead to the conviction, either that the executrix in fact paid the debts with the appropriate funds of the estate received by her; or that she so managed the matter, as to deprive the defendants of the power, of establishing it, if such was the fact; or, if she did not make the payment with those funds, that she made it voluntarily out of the annual products of the property, which belonged, to her, without charging or intending to charge any part of them against the remainder belonging to her children. Mrs. Chesson obviously looked upon her interest and her children’s as one and the same, and treated the property and her husband’s debts as her own. Hence, she used the property as if it were hers, absolutely, and made no inventory, nor account oí sales, nor account current, nor even kept any account of her own. Under such a state of things, it cannot be supposed, she intended or expected to reclaim any sums paid by her. But, if that were otherwise, the Court could not sustain a claim brought forward for the first time by her administrator thirty-five years after her administration, without her having left any accounts of her administration, whereby the real state of her transactions might appear, or the parties enabled to make the investigations necessary to ascertain the truth of the case. Her estate cannot claim any benefit from her having kept and left things so much in the dark, as not to make it at all wonderful, that at the making of the enqui-ries in 1851 — forty-four years after administration, — the defendants could not clearly establish the particulars of the
 
 *149
 
 estate received or disbursed by her. As was said by Lord Redesdale, in
 
 Hovenden
 
 v
 
 Amesby,
 
 2 Sch. and Lef. 638, following Lord Alvanley, in
 
 Hercy
 
 v Dinwoody, 4 Bro. C. C. 257, the Court, on grounds of public policy, canñot permit the accounts sought to be carried on, because the party, who otherwise might have been entitled to them, has been guilty of such laches as to make it impossible to take the accounts fairly and justly, or, at least, with any reasonable reliance on their being so taken.
 

 As Mrs. Chesson’s representative cannot have a decree, it follows that, for reasons similar to those given as to the maintenance of the children, the other plaintiffs can have no relief in respect to any supposed application by her of the profits of their land towards the debts. She did the wrong, if any; and to her estate they must look. This conclusion renders immaterial all the exceptions of the defendants, except the fifth, and req uires all those of the plaintiffs to be overruled, except the fourth and fifth. Two of those exceptions relate to the values put by the master on the slaves advanced by Mrs. Chessonto James A. Ches-son and John B. Cbesson, — the former being $1012, and. the latter $2337. Upon looking into the evidence, the former seems to be probably correct; but the latter appears to be high upon its face, and, upon averaging the values set upon the negroes by these witnesses, who have, apparently, equal means of judging, the result is $1975, instead of $2337, Therefore, the defendant’s fifth exception is overruled, and the plaintiff’s fourth exception is allowed as to the sum of $362. The administrator,
 
 de bonis non,
 
 of the testator also excepts, that the master did not allow him a commission on the hires of the negroes since Mrs. Ches-son’s death. He is entitled to a reasonable allowance, and, as the fund consists of the bonds taken for the hires, 2 1-2 per cent, seems to be a reasonable rate. To that extent
 
 *150
 
 the plaintiff’s fifth exception is allowed. The accounts ■ will be modified accordingly, and there will then be a decree for the division of the slaves and the hires, including the value of the advancements. The plaintiffs must pay the ■•costs up to this time.
 

 Per Curiam. Ordered accordingly.